IN THE

# United States Court of Appeals for the Federal Circuit

---

ENTROPIC COMMUNICATIONS, LLC,

v.

CHARTER COMMUNICATIONS, INC.

---

On Appeal from the United States District Court
for the Eastern District of Texas
Case No. 2:22-cv-00125 (Hon. Rodney Gilstrap)

---

**BRIEF OF THE REPORTERS COMMITTEE
FOR FREEDOM OF THE PRESS AND 19 MEDIA ORGANIZATIONS
AS *AMICI CURIAE* IN SUPPORT OF MOVANT-APPELLANT
ELECTRONIC FRONTIER FOUNDATION**

---

CHARLES DUAN
AMERICAN UNIVERSITY WASHINGTON
COLLEGE OF LAW
4300 Nebraska Ave. NW
Washington, DC 20016
(202) 274-4000
notices.ecf@cduan.com
*Counsel for Amici Curiae*

# CERTIFICATE OF INTEREST

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

**1. Represented Entities.** The full names of all entities represented by undersigned counsel in this case are listed in the table on the next page.

**2. Real Party in Interest.** There are no real parties in interest that differ from the represented entities.

**3. Parent Corporations and Stockholders.** The full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities are listed in the table on the next page.

**4. Legal Representatives.** There are no other law firms, partners, or associates that have appeared for the entities in the originating court or are expected to appear in this court for the entities.

**5. Related Cases.** Not applicable.

**6. Organizational Victims and Bankruptcy Cases.** Not applicable.

Dated: August 9, 2024

*/s/ Charles Duan*
Charles Duan
*Counsel of Record for Amici Curiae*

| 1. Represented Entity | 3. Parent Corporations and Stockholders |
|---|---|
| Reporters Committee for Freedom of the Press | The Reporters Committee for Freedom of the Press is an unincorporated association of reporters and editors with no parent corporation and no stock. |
| Axios Media Inc. | Axios Media Inc. is a privately owned company, and no publicly held company owns 10% or more of its stock. |
| BuzzFeed, Inc. | BuzzFeed Inc. is a privately owned company, and National Broadcasting Company (NBC) owns 10% or more of its stock. |
| The Center for Investigative Reporting, Inc. | The Center for Investigative Reporting, Inc. is a California non-profit public benefit corporation that is tax-exempt under section 501(c)(3) of the Internal Revenue Code. It has no statutory members and no stock. |
| Dow Jones & Company | Dow Jones & Company, Inc. ("Dow Jones") is an indirect subsidiary of News Corporation, a publicly held company. Ruby Newco, LLC, an indirect subsidiary of News Corporation and a non-publicly held company, is the direct parent of Dow Jones. News Preferred Holdings, Inc., a subsidiary of News Corporation, is the direct parent of Ruby Newco, LLC. No publicly traded corporation currently owns ten percent or more of the stock of Dow Jones. |
| Forbes Media LLC | Forbes Media LLC is a privately owned company and no publicly held corporation owns 10% or more of its stock. |
| Gannett Co., Inc. | Gannett Co., Inc. is a publicly traded company and has no affiliates or subsidiaries that are publicly owned. |
| Hearst Corporation | Hearst Corporation is privately held and no publicly held corporation owns 10% or more of Hearst Corporation. |
| Los Angeles Times Communications LLC | Los Angeles Times Communications LLC is wholly owned by NantMedia Holdings, LLC. |
| The McClatchy Company, LLC | The McClatchy Company, LLC is privately owned by certain funds affiliated with Chatham Asset Management, LLC and does not have publicly traded stocks. |
| National Newspaper Association | National Newspaper Association is a non-stock nonprofit Florida corporation. It has no parent corporation and no subsidiaries. |

| | |
|---|---|
| The National Press Club | The National Press Club is a not-for-profit corporation that has no parent company and issues no stock. |
| The National Press Photographers Association | National Press Photographers Association is a 501(c)(6) nonprofit organization with no parent company. It issues no stock and does not own any of the party's or amicus' stock. |
| NBCUniversal Media, LLC | Comcast Corporation and its consolidated subsidiaries own 100% of the common equity interests of NBCUniversal Media, LLC. |
| The New York Times Company | The New York Times Company is a publicly traded company and has no affiliates or subsidiaries that are publicly owned. No publicly held company owns 10% or more of its stock. |
| The News/Media Alliance | News/Media Alliance represents the newspaper, magazine, and digital media industries, including nearly 2,200 diverse news and magazine publishers in the United States and internationally. It is a nonprofit, non-stock corporation organized under the laws of the commonwealth of Virginia. It has no parent company. |
| POLITICO LLC | POLITICO LLC is wholly owned by POLITICO Media Group LLC, which is, in turn, wholly owned by Axel Springer SE, and no publicly held corporation owns ten percent or more of its stock. |
| Pro Publica, Inc. | Pro Publica, Inc. ("ProPublica") is a Delaware nonprofit corporation that is tax-exempt under section 501(c)(3) of the Internal Revenue Code. It has no statutory members and no stock. |
| Society of Professional Journalists | Society of Professional Journalists is a non-stock corporation with no parent company. |
| TEGNA Inc. | TEGNA Inc. has no parent company, and no publicly-held company has a 10% or greater ownership interest in TEGNA, Inc. |

# TABLE OF CONTENTS

**Page:**

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF AUTHORITIES ................................................................. v

INTEREST OF AMICI CURIAE ........................................................ viii

SOURCE OF AUTHORITY TO FILE ................................................ xv

FED. R. APP. P. 29(a)(4)(E) STATEMENT ........................................ xv

SUMMARY OF ARGUMENT ............................................................. 1

ARGUMENT ...................................................................................... 3

    I.  Journalists routinely rely on judicial records to inform the public about matters of urgent public concern, including in closed cases. ........................ 3

    II. Where the public's right of access to judicial records is at stake, intervention to unseal judicial records is virtually always timely. ................. 8

CONCLUSION ................................................................................. 11

CERTIFICATE OF COMPLIANCE .................................................... 12

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*Binh Hoa Le v. Exeter Fin. Corp.*,
  990 F.3d 410 (5th Cir. 2021) ................................................................. 6, 10, 11

*Blum v. Merrill Lynch Pierce Fenner & Smith, Inc.*,
  712 F.3d 1349 (9th Cir. 2013) ................................................................. 9

*Constand v. Cosby*,
  112 F. Supp. 3d 308 (E.D. Pa. 2015) ...................................................... 7

*Constand v. Cosby*,
  833 F.3d 405 (3d Cir. 2016) ................................................................... 7

*Cox Broad. Corp. v. Cohn*,
  420 U.S. 469 (1975) ........................................................................... 1, 3

*Doe v. Smith*,
  No. 2:23-cv-00423, 2024 WL 1240935 (D. Me. Mar. 22, 2024) ........................ 9

*Entropic Commc'ns, LLC v. Charter Commc'ns, Inc.*,
  No. 2:22-CV-00125, 2024 WL 1932413 (E.D. Tex. May 2, 2024) .............. 2, 4, 9

*Ericsson Inc. v. InterDigital Commc'ns Corp.*,
  418 F.3d 1217 (Fed. Cir. 2005) .............................................................. 6

*Fed. Deposit Ins. Co. v. Ernst & Ernst*,
  677 F.2d 230 (2d Cir. 1982) ................................................................... 9

*Flynt v. Lombardi*,
  782 F.3d 963 (8th Cir. 2015) ................................................................. 9

*Ford v. City of Huntsville*,
  242 F.3d 235 (5th Cir. 2001) ............................................................... 9, 10

*In re Am. Hist. Ass'n*,
  49 F. Supp. 2d 274 (S.D.N.Y. 1999) ........................................................ 1

v

*Lab'y Corp. of Am. Holdings v. Chiron Corp.*,
  384 F.3d 1326 (Fed. Cir. 2004) ........................................................ 6

*Mokhiber v. Davis*,
  573 A.2d 1100 (D.C. Cir. 1988) .................................................... 2, 9

*Muhaymin v. City of Phoenix*,
  No. CV-17-04565, 2021 WL 5173767 (D. Ariz. Nov. 3, 2021) ........................ 10

*Pansy v. Borough of Stroudsburg*,
  23 F.3d 772 (3d Cir. 1994) ......................................................... 7, 9

*Pub. Citizen v. Liggett Corp.*,
  858 F.2d 775 (1st Cir. 1988) ......................................................... 8

*Richmond Newspapers, Inc. v. Virginia*,
  448 U.S. 555 (1980) .................................................................. 1

*San Jose Mercury News, Inc. v. U.S. Dist. Ct. for N. Dist. of Cal.*,
  187 F.3d 1096 (9th Cir. 1999) ........................................................ 2

*Stallworth v. Monsanto Corp.*,
  558 F.2d 257 (5th Cir. 1977) ...................................................... 8, 9

*State Farm Fire & Cas. Co. v. Hood*,
  266 F.R.D. 135 (S.D. Miss. 2010) .................................................... 9

*Uniloc 2017 LLC v. Apple, Inc.*,
  964 F.3d 1351 (Fed. Cir. 2020) ...................................................... 8

*United Nuclear Corp. v. Cranford Ins. Co.*,
  905 F.2d 1424 (10th Cir. 1990) ...................................................... 9

*United States v. Moten*,
  582 F.2d 654 (2d Cir. 1978) ......................................................... 1

## Other Authorities:

Benjamin Lesser et al., *How Judges Added to the Grim Toll of Opioids*,
  Reuters (June 25, 2019) ....................................................... 1, 4, 5, 6

David Armstrong, *Drug Maker Thwarted Plan to Limit OxyContin Prescriptions at Dawn of Opioid Epidemic*, STAT News (Oct. 26, 2016) ....... 2, 5

David Armstrong, *Secret Trove Reveals Bold 'Crusade' to Make OxyContin a Blockbuster*, STAT News (Sept. 22, 2016) ...................................................... 4

Gregg Costa, *Federal Appellate Judge: Too Many Sealed Documents*, Nat'l L.J. (Feb. 15, 2016) ............................................................................................. 7

Harriet Ryan et al., *'You Want a Description of Hell?' OxyContin's 12-hour Problem*, L.A. Times (May 5, 2016) .................................................................... 5

John Myers, *What Did They Know and When Did They Know It?* L.A. Times (Feb. 15, 2017) ..................................................................................................... 4

Michael R. Sisak, *Bill Cosby's Graphic Testimony Could Undercut His Defense*, AP (Apr. 17, 2018) ................................................................................ 1

Order Granting Barber's Mot. to Intervene, *Aleksich v. Remington Arms Co., Inc.*, No. 2:91-cv-00005 (D. Mont. Feb. 6, 2012) ................................................. 5

Scott Cohn, *Huge Trove of Remington Rifle Documents Is Made Public*, CNBC (Nov. 15, 2016) ........................................................................................ 5

Walter V. Robinson & Matt Carroll, *Documents Show Church Long Supported Geoghan*, Bos. Globe (Jan. 24, 2002) ................................................. 2

# INTEREST OF AMICI CURIAE

Lead amicus the Reporters Committee for Freedom of the Press ("Reporters Committee"), is an unincorporated nonprofit association. The Reporters Committee was founded by leading journalists and media lawyers in 1970 when the nation's news media faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources. Today, its attorneys provide pro bono legal representation, amicus curiae support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists.

The Reporters Committee is joined by the following amici:

**Axios Media Inc.** is a digital media company with a mission to deliver news in an efficient format that helps professionals get smarter faster across an array of topics, including politics, science, business, health, tech, media, and local news.

**BuzzFeed, Inc.** is a social news and entertainment company that provides shareable breaking news, original reporting, entertainment, and video across the social web to its global audience of more than 200 million.

**The Center for Investigative Reporting, Inc.** is the nation's oldest nonprofit investigative newsroom in the country that runs the brands Mother Jones, Reveal, and CIR Studios. Mother Jones is a reader-supported news

magazine and website known for ground-breaking investigative and in-depth journalism on issues of national and global significance. Reveal produces investigative journalism for the Reveal national public radio show and podcast, and CIR Studios produces feature length documentaries distributed on Netflix, Hulu and other streaming channels. Reveal often works in collaboration with other newsrooms across the country.

**Dow Jones & Company** is the world's leading provider of news and business information. Through The Wall Street Journal, Barron's, MarketWatch, Dow Jones Newswires, and its other publications, Dow Jones has produced journalism of unrivaled quality for more than 130 years and today has one of the world's largest newsgathering operations. Dow Jones's professional information services, including the Factiva news database and Dow Jones Risk & Compliance, ensure that businesses worldwide have the data and facts they need to make intelligent decisions. Dow Jones is a News Corp company.

**Forbes Media LLC** is the publisher of Forbes Magazine as well as an array of investment newsletters and the leading business news website, Forbes.com. Forbes has been covering American and global business since 1917.

**Gannett** is the largest local newspaper company in the United States. Our more than 200 local daily brands in 43 states — together with the iconic USA TODAY — reach an estimated digital audience of 140 million each month.

**Hearst** is one of the nation's largest diversified media, information and services companies with more than 360 businesses. Its major interests include ownership of 15 daily and more than 30 weekly newspapers, including the San Francisco Chronicle, Houston Chronicle, and Albany Times Union; hundreds of magazines around the world, including Cosmopolitan, Good Housekeeping, ELLE, Harper's BAZAAR and O, The Oprah Magazine; 31 television stations such as KCRA-TV in Sacramento, Calif. and KSBW-TV in Monterey/Salinas, CA, which reach a combined 19 percent of U.S. viewers; ownership in leading cable television networks such as A&E, HISTORY, Lifetime and ESPN; global ratings agency Fitch Group; Hearst Health; significant holdings in automotive, electronic and medical/pharmaceutical business information companies; Internet and marketing services businesses; television production; newspaper features distribution; and real estate.

**Los Angeles Times Communications LLC** is one of the largest daily newspapers in the United States. Its popular news and information website, www.latimes.com, attracts audiences throughout California and across the nation.

**The McClatchy Company, LLC** is a publisher of iconic brands such as the *Miami Herald*, *The Kansas City Star*, *The Sacramento Bee*, *The Charlotte Observer*, *The* (Raleigh) *News & Observer*, and the *Fort Worth Star-Telegram*. McClatchy operates media companies in 30 U.S. markets in 16 states, providing each of its communities with high-quality news and advertising services in a wide array of digital and print formats. McClatchy is headquartered in Sacramento, California.

**National Newspaper Association** is a 2,000 member organization of community newspapers founded in 1885. Its members include weekly and small daily newspapers across the United States. It is based in Pensacola, FL.

**The National Press Club** is the world's leading professional organization for journalists. Founded in 1908, the Club has 3,100 members representing most major news organizations. The Club defends a free press worldwide. Each year, the Club holds over 2,000 events, including news conferences, luncheons and panels, and more than 250,000 guests come through its doors.

**The National Press Photographers Association** ("NPPA") is a 501(c)(6) non-profit organization dedicated to the advancement of visual journalism in its creation, editing and distribution. NPPA's members include television and still photographers, editors, students and representatives of businesses that serve the visual journalism industry. Since its founding in 1946, the NPPA has vigorously

promoted the constitutional rights of journalists as well as freedom of the press in all its forms, especially as it relates to visual journalism. The submission of this brief was duly authorized by Mickey H. Osterreicher, its General Counsel.

**NBCUniversal Media, LLC** is one of the world's leading media and entertainment companies in the development, production and marketing of news, entertainment and information to a global audience. Among other businesses, NBCUniversal Media, LLC owns and operates the NBC television network, the Spanish-language television network Telemundo, NBC News, several news and entertainment networks, including MSNBC and CNBC, and a television-stations group consisting of owned-and-operated television stations that produce substantial amounts of local news, sports and public affairs programming. NBC News produces the "Today" show, "NBC Nightly News with Lester Holt," "Dateline NBC" and "Meet the Press."

**The New York Times Company** is the publisher of *The New York Times* and operates the news website nytimes.com.

**The News/Media Alliance** represents over 2,200 diverse publishers in the U.S. and internationally, ranging from the largest news and magazine publishers to hyperlocal newspapers, and from digital-only outlets to papers who have printed news since before the Constitutional Convention. Its membership creates quality journalistic content that accounts for nearly 90 percent of daily

newspaper circulation in the U.S., over 500 individual magazine brands, and dozens of digital-only properties. The Alliance diligently advocates for newspapers, magazine, and digital publishers, on issues that affect them today.

**POLITICO** is a global news and information company at the intersection of politics and policy.  Since its launch in 2007, POLITICO has grown to nearly 300 reporters, editors and producers.  It distributes 30,000 copies of its Washington newspaper on each publishing day and attracts an influential global audience of more than 35 million monthly unique visitors across its various platforms.

**Pro Publica, Inc.** ("ProPublica") is an independent, nonprofit newsroom that produces investigative journalism in the public interest. It has won six Pulitzer Prizes, most recently a 2020 prize for national reporting, the 2019 prize for feature writing, and the 2017 gold medal for public service. ProPublica is supported almost entirely by philanthropy and offers its articles for republication, both through its website, propublica.org, and directly to leading news organizations selected for maximum impact. ProPublica has extensive regional and local operations, including ProPublica Illinois, which began publishing in late 2017 and was honored (along with the Chicago Tribune) as a finalist for the 2018 Pulitzer Prize for Local Reporting, an initiative with the

Texas Tribune, which launched in March 2020, and a series of Local Reporting Network partnerships.

**Society of Professional Journalists** ("SPJ") is dedicated to improving and protecting journalism. It is the nation's largest and most broad-based journalism organization, dedicated to encouraging the free practice of journalism and stimulating high standards of ethical behavior. Founded in 1909 as Sigma Delta Chi, SPJ promotes the free flow of information vital to a well-informed citizenry, works to inspire and educate the next generation of journalists and protects First Amendment guarantees of freedom of speech and press.

**TEGNA Inc.** owns or services (through shared service agreements or other similar agreements) 64 television stations in 52 markets.

## SOURCE OF AUTHORITY TO FILE

Appellant Electronic Frontier Foundation and Defendant-Appellee Charter Communications have consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(2).

## FED. R. APP. P. 29(a)(4)(E) STATEMENT

Amici declare that:

1. no party's counsel authored the brief in whole or in part;

2. no party or party's counsel contributed money intended to fund preparing or submitting the brief; and

3. no person, other than amici, their members or their counsel, contributed money intended to fund preparing or submitting the brief.

# SUMMARY OF ARGUMENT

Journalists and news organizations routinely move to intervene to unseal long-secret judicial records "to inform citizens about the public business," *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 496 (1975)—the role the First Amendment expects them to play as "surrogates for the public," *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980) (plurality opinion). Routinely, too, they do so in cases in which it would have been difficult (or impossible) to seek transparency in real time. The significance of a past accusation of sexual misconduct may not be clear until a second victim steps forward,[1] and the importance of a prior product-safety lawsuit may not be apparent until a defect misfires again.[2] Moreover, the passage of time often dissolves any basis for concealing records of great historical significance or other interest to the public.[3] *See, e.g.*, *United States v. Moten*, 582 F.2d 654, 661 (2d Cir. 1978) (interest in sealing records to protect ongoing criminal investigation "does not ongo forever").

---

[1] *See, e.g.*, Michael R. Sisak, *Bill Cosby's Graphic Testimony Could Undercut His Defense*, AP (Apr. 17, 2018), https://perma.cc/8TZZ-MCRB (noting that the 2015 unsealing of a 2005 deposition of Bill Cosby led to new charges against him).

[2] *See, e.g.*, Benjamin Lesser et al., *How Judges Added to the Grim Toll of Opioids*, Reuters (June 25, 2019), https://bit.ly/3YcLslq (describing the delayed unsealing of evidence that Purdue Pharma knew of Oxycontin's addiction risks).

[3] *See, e.g.*, *In re Am. Hist. Ass'n*, 49 F. Supp. 2d 274, 291 (S.D.N.Y. 1999) (unsealing "fifty-year old grand jury materials" related to Alger Hiss).

In common-sense recognition of those dynamics, courts have tolerated "delays measured in years . . . where an intervenor is pressing the public's right of access to judicial records," *San Jose Mercury News, Inc. v. U.S. Dist. Ct. for N. Dist. of Cal.*, 187 F.3d 1096, 1101 (9th Cir. 1999), as Movant-Appellant the Electronic Frontier Foundation ("Appellant" or "EFF") does here.  Rightfully so, because that right of public access "exists today for the records of cases decided a hundred years ago as surely as it does for lawsuits now in the early stages of motions litigation."  *Mokhiber v. Davis*, 573 A.2d 1100, 1105 (D.C. Cir. 1988).

Here, however, the District Court held that the passage of a mere five months precluded EFF—and presumably any future members of the press or public with an interest in this case—from moving to unseal judicial records in this action. S*ee* Mem. Op. & Order Denying Mot. to Intervene & Unseal at 4, *Entropic Commc'ns, LLC v. Charter Commc'ns, Inc.*, No. 2:22-CV-00125 (E.D. Tex. May 2, 2024), ECF No. 430 [hereinafter "Order"].  That holding is an extraordinary outlier:  It would have barred the *Boston Globe*'s pathbreaking reporting on sexual abuse in the Roman Catholic Church, *see* Walter V. Robinson & Matt Carroll, *Documents Show Church Long Supported Geoghan*, Bos. Globe (Jan. 24, 2002), https://perma.cc/X57F-M88Z, essential coverage of the opioid crisis, *see* David Armstrong, *Drug Maker Thwarted Plan to Limit OxyContin Prescriptions at Dawn of Opioid Epidemic*, STAT News (Oct. 26, 2016), https://perma.cc/WNX8-4Y9B,

and any number of other vital works of investigative journalism. As those examples should make clear, the decision under review misconstrues the standards governing intervention to assert the press and public's presumptive right to inspect judicial records.

For the reasons herein, *amici*—media organizations that exercise the right of access on a routine basis, in order to inform the public about matters of clear public concern—respectfully urge that the District Court's order be reversed.

## ARGUMENT

### I. Journalists routinely rely on judicial records to inform the public about matters of urgent public concern, including in closed cases.

"In a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring him in convenient form the facts[.]" *Cox Broad. Corp.*, 420 U.S. at 491. Nothing about that function fades in importance while records that should have been public gather dust in locked filed cabinets instead. On the contrary, in those cases, the news media often plays a critical role by intervening to unseal long-secret documents whose significance escaped public notice in the first instance—even if months, years, or even decades have passed in the interim. The decision under review, if it were the law, would effectively bar that work, and with it a raft of vital investigative journalism.

Consider corporate accountability. Often the raw material of any cover-up—"Who knew what? And when?" John Myers, *What Did They Know and When Did They Know It?* L.A. Times (Feb. 15, 2017), https://perma.cc/BLF9-6TY9—is documented somewhere in a court's files, if only the public knew to look for it. Reporting that revealed Purdue Pharmaceutical's efforts to undermine regulatory efforts while boosting sales of OxyContin, for instance, was based in important part on documents unsealed more than a decade after a key case settled. *See* David Armstrong, *Secret Trove Reveals Bold 'Crusade' to Make OxyContin a Blockbuster*, STAT News (Sept. 22, 2016), https://perma.cc/3NAJ-7VSK. In 2001, when West Virginia became the first state to accuse Purdue of misleading doctors about the addiction risk of its products, all of the relevant argument and evidence remained secret because—as here, *see* Order at 7 (relying on stipulated protective order in denying EFF's motion to unseal records)—"[l]awyers for Purdue and the state agreed between themselves" that it should be, Lesser et al., *supra*. Worse yet, because the judge "provided no rationale" before approving the parties' agreement, the press and public had no notice of the issues at stake in the sealing order—notice that might have enabled journalists to intervene sooner. *Id.*

The importance of the evidence under wraps in West Virginia became clear only after a source provided key Purdue documents to the *Los Angeles Times* in 2016, illustrating that the company had known "for decades" that Oxycontin's

effects might wear off sooner than advertised, creating dangerous addiction risks. *See* Harriet Ryan et al., *'You Want a Description of Hell?' OxyContin's 12-hour Problem*, L.A. Times (May 5, 2016), https://perma.cc/7AWJ-TFGX.  Faced with that reporting, the West Virginia judge who had first sealed the case file in 2004 unsealed further records to other news organizations who intervened in the case, powering yet more reporting that helped the public—and lawmakers—understand the origins of the deadly opioid crisis.  *See* Lesser et al., *supra*; Armstrong, *supra*.

The Purdue example is not an outlier.  In another prominent case, unsealed court records—some kept secret for more than a decade—formed the basis for reporting about a faulty Remington trigger that led to dozens of deaths over nearly 70 years.  *See* Scott Cohn, *Huge Trove of Remington Rifle Documents Is Made Public*, CNBC (Nov. 15, 2016),  https://perma.cc/6VFF-5FHH.  Richard Barber, a man who had lost his own son to the defect, learned from reporting by CNBC that Remington continued to use the design and defend its safety; he then successfully intervened in a long-closed case brought by another victim that "contain[ed] the most extensive and compelling collection of documents regarding Remington's knowledge of the Walker fire control's propensity to malfunction."  Order Granting Barber's Mot. to Intervene at 4, *Aleksich v. Remington Arms Co., Inc.*, No. 2:91-cv-00005 (D. Mont. Feb. 6, 2012), https://perma.cc/VT66-2JTZ.

More broadly, a recent review by Reuters "found that hundreds of thousands of people were killed or seriously injured by allegedly defective products after judges in just a handful of cases allowed litigants to file under seal, beyond public view, evidence that could have alerted consumers and regulators." Lesser et al., *supra*. And if the passage of just a few months could foreclose future efforts by the press and public to challenge such sealing, as the District Court concluded, the information necessary to provide accountability might never see the light of day.

Reporting on allegations of sexual misconduct has followed the same course. To take just two examples, the U.S. Court of Appeals for the Fifth Circuit has pointed to "Bill Cosby's deposition testimony" and "records detailing the cover-up of child sexual abuse" in the Catholic Church as two especially important instances in which judicial documents drove reporting about matters of public interest. *Binh Hoa Le v. Exeter Fin. Corp.*, 990 F.3d 410, 421 (5th Cir. 2021).[4] But on the view the District Court took in this case, both those efforts would have been untimely, having come well more than five months after the documents were first filed.

---

[4]    This Court "appli[es] the law of the regional circuit to which the district court appeal normally lies unless the issue pertains to or is unique to patent law," *Lab'y Corp. of Am. Holdings v. Chiron Corp.*, 384 F.3d 1326, 1330 (Fed. Cir. 2004) (internal citation omitted), such that Fifth Circuit law governs EFF's appeal here, *see Ericsson Inc. v. InterDigital Commc'ns Corp.*, 418 F.3d 1217, 1220–21 (Fed. Cir. 2005) (applying Fifth Circuit law in reviewing ruling on motion to intervene).

With respect to the latter, as then-Judge Gregg Costa has noted, "the turning point in breaking the story" of misconduct in the Archdiocese of Boston "came when [*The Boston Globe*] obtained access to previously sealed court documents," records that "had been sitting for years in the court files of a lawsuit filed against the archdiocese." Gregg Costa, *Federal Appellate Judge: Too Many Sealed Documents*, Nat'l L.J. (Feb. 15, 2016), https://perma.cc/UVX8-QP7B. In Cosby's case, too, the deposition that would later spark a renewed criminal case was first filed with the U.S. District Court for the Eastern Pennsylvania in 2005, years before it ultimately saw the light of day. *See Constand v. Cosby*, 112 F. Supp. 3d 308, 310 (E.D. Pa. 2015), *vacated as moot*, 833 F.3d 405, 412–13 (3d Cir. 2016). And while the Associated Press attempted to intervene at the time, the district court "never revisited" the temporary sealing of the records after the parties reached a settlement. 833 F.3d at 311. Only years later in 2014, "after more recent allegations of similar misconduct by [Cosby] gained public attention," did the court grant the Associated Press's renewed motion to intervene and unseal the key testimony. *Id.*

The list could go on. In each case, though, the point is the same: The press and public "may often have no way of knowing at the time a confidentiality order is granted what relevance the settling case has to their interests," and therefore no opportunity to intervene to challenge secrecy in the first instance. *Pansy v.*

*Borough of Stroudsburg*, 23 F.3d 772, 780 (3d Cir. 1994). In each case, if the press had no later chance to intervene to advocate for transparency, those important stories might have gone untold. And in each case, the theory of the decision under review would have ensured the public was kept in the dark about grave dangers or serious misconduct. That result would undermine the core promise of the right of public access to judicial records: to ensure that the open debate on public issues the First Amendment guarantees is an "informed and enlightened" one. *Uniloc 2017 LLC v. Apple, Inc.*, 964 F.3d 1351, 1358 (Fed. Cir. 2020) (citation omitted).

## II. Where the public's right of access to judicial records is at stake, intervention to unseal judicial records is virtually always timely.

To protect just the sort of journalism described above, the overwhelming weight of authority holds that the press and public may intervene to unseal judicial records months, years or even decades later—including, as here, where the parties might have hoped a case was over. The District Court's contrary ruling was error.

Whether intervention is timely weighs "[t]he length of time during which the would-be intervenor actually know or reasonably should have known of his interest in the case;" the "prejudice"—if any—"that the existing parties to the litigation may suffer" due to the passage of time; "the prejudice that the would-be intervenor may suffer if his petition for leave to intervene is denied;" and the "existence of unusual circumstances militating either for or against a determination that the application is timely." *Stallworth v. Monsanto Corp.*, 558 F.2d 257, 264–66 (5th

8

Cir. 1977). And applying a standard identical to the Fifth Circuit's, other federal courts of appeals have found that "delays measured in years" are no obstacle to advocating for access. *Pub. Citizen v. Liggett Corp.*, 858 F.2d 775, 785 (1st Cir. 1988) (citing *Wilson v. Am. Motors Corp.*, 759 F.2d 1568 (11th Cir. 1985), *Stallworth*, 558 F.2d at 257); *see also, e.g.*, *State Farm Fire & Cas. Co. v. Hood*, 266 F.R.D. 135, 143 (S.D. Miss. 2010) (under *Stallworth*, intervention after 15 months was timely). Indeed, a mountain of authority supports that "consensus among the courts of appeals that intervention to challenge confidentiality orders may take place long after a case has been terminated," *Pansy*, 23 F.3d at 779[5]— one so uniform that some courts have questioned whether timeliness is ever a barrier when the news media moves to unseal records, *see Doe v. Smith*, No. 2:23-cv-00423, 2024 WL 1240935, at *3 (D. Me. Mar. 22, 2024).

The only explanation the District Court gave for its stark departure from this principle was that "allowing EFF to intervene would be prejudicial to the parties because the case team has already disbanded, and the parties would have to revisit

---

[5]    *See also, e.g.*, *Flynt v. Lombardi*, 782 F.3d 963, 965 n.2 (8th Cir. 2015) (intervention after one year was timely); *Blum v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 712 F.3d 1349, 1353 (9th Cir. 2013) (intervention in case "concluded for years" was timely); *United Nuclear Corp. v. Cranford Ins. Co.*, 905 F.2d 1424, 1427 (10th Cir. 1990) (intervention after three years was timely); *Fed. Deposit Ins. Co. v. Ernst & Ernst*, 677 F.2d 230, 231–32 (2d Cir. 1982) (intervention after two years was timely); *Mokhiber*, 537 A.2d at 1105 (intervention after four years was timely).

confidentiality issues they reasonably believed were settled." Order at 4. But the Fifth Circuit has already flatly rejected that rationale. In *Ford v. City of Huntsville*, 242 F.3d 235 (5th Cir. 2001), the court reversed the denial of a newspaper's motion to intervene to modify a protective order one month after the case had settled, explaining forthrightly that "because [the intervenor] seeks only to litigate the issue of the confidentiality order and not to reopen the merits of the dispute between the original parties, even a greater delay in the intervention would not have prejudiced the parties," *id.* at 240. As the (many) closed cases already cited above make clear, every other court of appeals likewise agrees that the obligation to respond to a motion to unseal—however long the case has been closed—is not prejudice. And, indeed, "[t]he mere fact that [the parties] will need to explain why the relevant records should remain sealed is not, itself, unduly prejudicial" because "[i]t is, after all, their burden to establish that either good cause or compelling reasons justify curtailing the public's right to access judicial records." *Muhaymin v. City of Phoenix*, No. CV-17-04565, 2021 WL 5173767, at *2 (D. Ariz. Nov. 3, 2021).

"Judicial records belong to the American people; they are public, not private, documents." *Binh Hoa Le*, 990 F.3d at 417. On the District Court's rationale, parties can instead purchase permanent secrecy by settling an action before the news media has a chance to intervene. If upheld, that ruling would impose an

intolerable obstacle in the way of vital investigative reporting—and with it the public's right to know.  But as Fifth Circuit precedent and first principles of judicial transparency make clear, there is no basis in law for a rule that would have barred the AP from unsealing "Bill Cosby's deposition testimony" and the *Boston Globe* from unearthing "records detailing the cover-up of child sexual abuse."  *Id.* at 421.  The District Court's order should be reversed.

## CONCLUSION

For the foregoing reasons, amici respectfully urge the Court to reverse the decision of the District Court.

Dated: August 9, 2024

Respectfully submitted,

*/s/ Charles Duan*
CHARLES DUAN
AMERICAN UNIVERSITY WASHINGTON
   COLLEGE OF LAW
4300 Nebraska Ave. NW
Washington, DC 20016
(202) 274-4000
notices.ecf@cduan.com
*Counsel for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

The foregoing filing complies with the relevant type-volume limitation of the

Federal Rules of Appellate Procedure and the Federal Circuit Rules. The filing has

been prepared using a proportionally-spaced typeface and includes 4,040 words.

Dated: August 9, 2024

*/s/ Charles Duan*
Charles Duan
*Counsel of Record for Amici Curiae*